**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| In Re **ALFRED L. FERNANDEZ**, | § | |
| | § | |
| **Debtor.** | § | |
| | § | |
| | § | |
| **ALFRED L. FERNANDEZ**, | § | |
| | § | |
| **Appellant**, | § | |
| | § | |
| v. | § | **EP-11-CV-123-KC** |
| | § | |
| **J. MARSHALL MILLER, Chapter 7** | § | |
| **Trustee**, | § | |
| | § | |
| **Appellee.** | § | |

<u>**ORDER**</u>

On this day, the Court considered Alfred L. Fernandez's ("Debtor") appeal from a final order of the United States Bankruptcy Court for the Western District of Texas. Appellant has requested oral argument pursuant to Federal Rule of Bankruptcy Procedure 8012. However, after reviewing the briefs and the record, the Court has determined that oral argument is not needed because the briefs and record adequately present the facts and legal arguments. *See* Fed. R. Bankr. P. 8012.

For the reasons set forth below, the bankruptcy court's order is **REVERSED** and **REMANDED**.

## I.    BACKGROUND

The relevant facts of this case are undisputed. Debtor was born, raised, and educated in El Paso, Texas. He purchased a home in El Paso in 1987, and resided there while working in El Paso until 2000. At that time Debtor was laid off from his job in El Paso and moved to Nevada

for work. He lived in Nevada until 2009, but never sold his El Paso home. He continued to make the payments on it, and always intended to keep it as his homestead. In January 2009, Debtor moved back to El Paso and took up residence at his El Paso home. He filed a petition for bankruptcy approximately one year later, on December 31, 2009. As of the date of filing his petition, Debtor held approximately $70,000 in equity in the home.

In his petition, Debtor claimed the unlimited homestead exemption under Texas law for his home. The trustee, J. Marshall Miller ("Trustee"), objected, and Debtor amended his petition, with the consent of Trustee, to claim the $550,000 homestead exemption under Nevada law instead. Trustee again objected, and after a hearing, the bankruptcy court sustained the objection and held that Debtor was not eligible to claim the Nevada exemptions. *See In re Fernandez*, 445 B.R. 790 (Bankr. W.D. Tex. 2011); Order Denying Claim of Exemption, *In re Alfred L Fernandez*, No. 09-32896-C (Bankr. W.D. Tex. Mar. 4, 2011), ECF No. 35. Debtor now appeals the bankruptcy court's ruling.

## II.    JURISDICTION

District courts have jurisdiction to hear "appeals from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings" under the bankruptcy laws in Title 11 of the United States Code. 28 U.S.C. § 158(a). Such proceedings include so-called "core proceedings," such as rulings on the "allowance or disallowance of . . . exemptions from property of the estate." *Id.* § 157(b)(2)(B). Unlike in non-bankruptcy cases, a final order for the purposes of § 158 appellate jurisdiction need not dispose of the entire case; under § 158 a final order is any order that "ends a discrete judicial unit in the larger case." *Smith v. Revie* (*In re Moody*), 817 F.2d 365, 367-68 (5th Cir. 1987). An order of a bankruptcy court granting or

2

denying an exemption is a final order for the purposes of § 158(a). *See England v. FDIC* (*In re England*), 975 F.2d 1168, 1172 (5th Cir. 1992) ("An order which grants or denies an exemption will be deemed a final order for the purposes of 28 U.S.C. § 158(d)."). Here, the order of the bankruptcy judge denied Debtor an exemption, so it is a final order and therefore this Court has jurisdiction over the appeal from that order. *See* Order Denying Claim of Exemption, *In re Alfred L Fernandez*, No. 09-32896-C (Bankr. W.D. Tex. Mar. 4, 2011), ECF No. 35.

## III. STANDARD OF REVIEW

"When reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a appellate court and applies the standard of review generally applied in federal court appeals." *Webb v. Reserve Life Ins. Co.* (*In re Webb*), 954 F.2d 1102, 1103-04 (5th Cir. 1992) (citing *Griffith v. Oles* (*In re Hipp, Inc.*), 895 F.2d 1503, 1517 (5th Cir. 1990)). Federal Rule of Bankruptcy Procedure 8013 provides that district courts shall not set aside a bankruptcy court's findings of fact unless clearly erroneous. Fed. R. Bankr. P. 8013. But the Court reviews the bankruptcy court's conclusions of law *de novo*, and is not required to extend any deference to the bankruptcy court's analysis. *Milligan v. Trautman*, 340 B.R. 773, 776 (W.D. Tex. 2006) (citing *Coston v. Bank of Malvern*, 987 F.2d 1096, 1099 (5th Cir.1992)).

## IV. DISCUSSION

The Court proceeds by first setting out as background the general operation of bankruptcy law in this area. Then, the Court examines the specific bankruptcy law provision that is at issue in this case. Because the precise meaning of that provision is unclear, the Court considers in turn the three different approaches courts have taken when interpreting the statute. After determining which interpretation best reflects Congress's intent, the Court proceeds to apply it to the facts of

this case.

**A.**         **Application of State Homestead Exemptions in Bankruptcy**

The estate in a bankruptcy proceeding consists of the property belonging to a debtor, which is to be distributed, or sold and the proceeds distributed, to the Debtor's creditors. *See Owen v. Owen*, 500 U.S. 305, 308 (1991). However, debtors may exempt certain property from the estate so that they might have the minimal resources needed to regain their financial footing and have a "fresh start." *See In re Williams*, 369 B.R. 470, 476 (Bankr. W.D. Ark. 2007); *Owen*, 500 U.S. at 308 ("An exemption is an interest withdrawn from the estate (and hence from the creditors) for the benefit of the debtor."). Congress has long allowed debtors to claim as exempt either the property listed in federal bankruptcy statutes or in state exemption laws. *Camp v. Ingalls* (*In re Camp*) (*Camp II*), 631 F.3d 757, 759-60 (5th Cir. 2011) (citing 11 U.S.C. § 522(b)(1)). However, bankruptcy law permits states to "opt-out" of the federal set of exemptions and thereby limit debtors governed by such states' law to the use of that state's exemptions. 11 U.S.C. § 522(b)(1)-(2) ("an individual debtor may exempt from property of the estate the property listed in [federal exemption law] . . . unless the State law that is applicable to the debtor . . . specifically does not so authorize"). Most states have in fact opted out, and restrict debtors subject to their laws to using the state exemptions. *Graziadei v. Graziadei* (*In re Graziadei*), 32 F.3d 1408, 1410 n.3 (9th Cir. 1994) (noting that most states, including Nevada, have opted out).

Prior to 2005, the bankruptcy statute specified that the applicable state exemption law was the law of the state that had been the debtor's domicile for the greater part of 180 days preceding the filing of the petition. 11 U.S.C. § 522(b)(2)(A) (2004); *Stephens v. Holbrook* (*In re Stephens*), 402 B.R. 1, 3 (B.A.P. 10th Cir. 2009). In 2005, through the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress amended this section

of the bankruptcy laws to extend the time that a debtor must live in a state before being able to

claim that state's exemptions, from the greater part of 180 days to 730 days. *See* BAPCPA, Pub.

L. No. 109-8, § 307, 119 Stat. 23, 81 (2005); *In re Varanasi*, 394 B.R. 430, 434 n.5 (Bankr. S.D.

Ohio 2008) (citing *In re Virissimo*, 332 B.R. 201, 203 (Bankr. D. Nev. 2005)). Congress's

purpose in extending the "look-back" window was to prevent debtors from forum-shopping by

moving to a state with generous exemption laws, living there for 91 days (that being the greater

part of 180 days), and then filing for bankruptcy. *Stephens*, 402 B.R. at 3 n.8; *Drummond v.*

*Urban* (*In re Urban*), 375 B.R. 882, 889 (B.A.P. 9th Cir. 2007) (citing H.R. Rep. No. 109-31, pt.

1, at 15-16 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 102) (describing BAPCPA as closing the

"so-called 'mansion loophole,'" whereby debtors relocate to states where they can shield

virtually all of the equity in their homes from their creditors); *In re Bingham*, No. 06–40990,

2008 WL 186277, at *5 (Bankr. D. Kan. Jan. 18, 2008) ("the changes to the domicile

requirements for exemptions were primarily, if not solely, intended to prevent debtors from"

forum-shopping to protect assets under certain states' more generous bankruptcy exemptions).

The amended statute, § 522(b), now reads,

(1) . . . [A]n individual debtor may exempt from property of the estate the property
listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection
. . . .

(2) Property listed in this paragraph is property that is specified under [the federal
bankruptcy law exemptions], unless the State law that is applicable to the debtor
under paragraph (3)(A) specifically does not so authorize.

(3) Property listed in this paragraph is--
    (A) . . . any property that is exempt under Federal law, other than [the
    federal bankruptcy law exemptions], or State or local law that is applicable

on the date of the filing of the petition to the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition or if the debtor's domicile has not been located in a single State for such 730-day period, the place in which the debtor's domicile was located for 180 days immediately preceding the 730-day period or for a longer portion of such 180-day period than in any other place;

. . . .

If the effect of the domiciliary requirement under subparagraph (A) is to render the debtor ineligible for any exemption, the debtor may elect to exempt property that is specified under subsection (d) [the federal exemptions].

11 U.S.C. §522(b).

The effect of the amended statute is that if a debtor has not lived in one state for the requisite 730 days preceding the filing of the petition, the law requires the debtor to use the exemption laws of the state where he lived for the greater part of the 180 days preceding that 730 day period. *Stephens*, 402 B.R. at 4. If that state's opt-out law prevents a debtor from choosing the federal exemptions and also prevents the debtor from using the state exemptions, then under the so-called "savings clause" or "hanging paragraph" at the end of the quoted language above, the debtor can use the federal exemptions as a fall-back. *Urban*, 375 B.R. at 889.

The application under the 730 day look-back provision of the exemption laws of a debtor's former state of domicile to the debtor and his property, which after the debtor's move are both likely located outside the state, is known as the extraterritorial application of state exemption law. *Stephens*, 402 B.R. at 4-5. As some authorities have recognized, extraterritoriality of exemption laws is best split into two aspects: whether a non-resident can use a state's exemption laws, and whether a state's exemption laws can apply to property outside the state. *See In re Arrendondo-Smith*, 436 B.R. 412, 417 (Bankr. W.D. Tex. 2010); *In re Calhoun*,

47 B.R. 119, 122-23 (Bankr. E.D. Va. 1985); Hon. W.H. Brown et al., *Bankruptcy Exemption Manual* § 4:6 (2010 ed.). Both aspects can affect the ultimate determination of whether a non-resident may claim protection of property, depending on the precise factual scenario. As one treatise has explained it,

> There are two major issues presented by the domiciliary changes in section 522(b). One is whether the applicable state's exemptions, typically the homestead, may be used on property located outside of that state . . . . A second, and separate, issue is whether a state permits use of its exemptions only by its residents or domiciliaries . . . . In other words, the domiciliary look-back presents questions not simply of which state's exemptions control but whether those exemptions may be used by a debtor who is no longer domiciled in, or a resident of, that state.

Brown et al., *supra*, § 4:6.

Although this treatise describes the issue as one created by BAPCPA, the issue of extraterritoriality is not a new one, and courts occasionally faced it pre-BAPCPA, either a result of moving debtors or simply from debtors trying to claim exemptions on property located in other states. *See, e.g.*, *Arrol v. Broach* (*In re Arrol*), 170 F.3d 934, 935-36 (9th Cir. 1999); *In re Schulz*, 101 B.R. 301, 302 (Bankr. N.D. Fla. 1989); *Calhoun*, 47 B.R. at 121-22; *see also In re Garrett*, 435 B.R. 434, 439 n.5 (Bankr. S.D. Tex. 2010) (noting the similarity of the issue pre- and post-BAPCPA); Dale Joseph Gilsinger, Annotation, *Extraterritorial Application of State's Homestead Exemption Pursuant to Bankruptcy Code § 522* §§ 4-5, 47 A.L.R. Fed. 2d 335 (2010) (listing other pre-BAPCPA cases finding both for and against extraterritoriality). However, the changes wrought by BAPCPA have caused the issue to arise much more frequently. *See Fernandez*, 445 B.R. at 803.

After BAPCPA, when the issue of extraterritorial application of state exemption law arises, it usually does so in one of two ways: first, a debtor seeks to use the state exemptions of

his former state of domicile while he is residing in a new state or for property located out of state, *see, e.g., Williams*, 369 B.R. at 471; or second, the debtor seeks to use the federal exemptions but the opt-out law of his former state of domicile prevents him from doing so. *See, e.g., Camp II*, 631 F.3d at 759. The issue involved in this appeal relates to the first type of situation. Because Debtor had not lived in Texas for 730 days prior to filing his petition, he had to use the exemption law of the state where he lived for the 180 days preceding 730 days prior to filing his petition, that being Nevada. However, as a result Debtor was forced to claim the homestead exemption from a state where he no longer lives, and where his property is not located. Trustee objected to Debtor's claimed homestead exemption for this reason, arguing that Debtor could not use the "exemption of homestead property under Nevada exemption statutes for property located in Texas." Trustee's Objection to Debtors' Schedule-C Property Claimed as Exempt, *In re Alfred L Fernandez*, No. 09-32896-C (Bankr. W.D. Tex. June 11, 2010), ECF No. 15. The issue is a significant one for Debtor, because his assets include approximately $71,000 in equity in his home in El Paso, Texas, and the Nevada and federal homestead exemptions protect the value of his homestead to different degrees. The Nevada homestead exemption protected up $550,000 of home equity, while the federal homestead exemption as of the date Debtor filed his petition protected only $20,200 of home equity. *Fernandez*, 445 B.R. at 794; Appellant's Brief 7.

Debtor argues that he may use the Nevada state exemptions either because any possible state law limits upon extraterritorial effects of state exemption law are preempted by federal bankruptcy law, or because as a matter of state law Nevada's exemptions are not limited to resident debtors or property located in Nevada. Appellant's Brief 20. Trustee contends that the bankruptcy court below correctly determined that state exemption laws can never have

extraterritorial effect, regardless of what any state's law may indicate. Appellee's Brief 6-10.[1]

**B.      Statutory Interpretation**

The issue on appeal is at its core one of statutory interpretation: what was Congress's intent when it required debtors to use exemption laws of their former state of domicile? "'The objective of a court called upon to interpret a statute is to ascertain congressional intent and give effect to legislative will.'" *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 194 (5th Cir. 2011) (quoting *Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998)). The Court begins with the language of the statute, as "[t]he Supreme Court has repeatedly counseled that in statutory interpretation, 'courts must presume that a legislature says in a statute what it means and means in a statute what it says.'" *United States v. Johnson*, 632 F.3d 912, 922 (5th Cir. 2011) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). "When the statutory 'language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296-97 (2006) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)). In addition, courts must read a "'statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous.'" *Waggoner v. Gonzales*, 488 F.3d 632, 636 (5th Cir. 2007) (quoting *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006)).

The plain language of the statute unfortunately does not resolve the issue. The most

---

[1]      Trustee's brief as the appellee is essentially an abridged version of the bankruptcy court's order that incorporates the bankruptcy judge's arguments wholesale. Because the bankruptcy court's order presents the argument in greater depth and complexity and Trustee appears to share entirely the bankruptcy court's position, in its analysis the Court primarily cites and refers to the bankruptcy court's order.

literal interpretation of the language allows Debtor to exempt

> any property that is exempt under . . . State or local law that is applicable on the date of the filing of the petition to the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition, or if the debtor's domicile has not been located in a single State for such 730-day period, the place in which the debtor's domicile was located for 180 days immediately preceding the 730-day period.

11 U.S.C. § 522(b)(3)(A).

Here, that means Debtor is allowed to exempt property that is exempt under Nevada law, since that is where he lived for the 180 day period prior to the 730 day period preceding the filing of his petition.  But this is ambiguous as to precisely how Nevada state law should be applied. Should the Court strictly construe the phrase "is exempt" and look to what Nevada courts would allow debtors to exempt in non-bankruptcy actions?  Should the Court look to Nevada law to see if Nevada would permit out-of-state property to be exempt in bankruptcy?  Or should the Court treat the subsection as a choice of law provision, and simply apply the categories and amounts of Nevada exemptions to Debtor's bankruptcy estate, paying no attention to any potential limitations Nevada law might impose on applying Nevada law outside Nevada?  The statute's terse command to determine what "is exempt under . . . State" law  provides no clear answer.

A split in the case law on how to apply the rule reflects this ambiguity.  At present, after approximately four years of cases interpreting the statute as amended by BAPCPA, courts and commentators have split into essentially three groups of opinion on how to apply this provision. The first interpretation, which the Court terms the anti-extraterritoriality interpretation, maintains that state exemption laws can never apply extraterritorially.  Therefore, in bankruptcy proceedings, to the extent that a debtor is no longer domiciled in a state or his property is no longer located there, that state's exemption laws are inapplicable to him and he must instead rely

on the federal exemptions. It appears that the bankruptcy court below is currently the only federal court to interpret the statute in this manner. *See Fernandez*, 445 B.R. at 816. The second view, held by the majority of courts to consider the issue, holds that while states may not apply their exemption laws outside their borders, in the bankruptcy context it is the federal government giving the laws extraterritorial effect, so it is permissible to apply state exemption laws to non-residents and out-of-state property to the extent that the state laws, by their terms, allow for it. *See, e.g., Arrol*, 170 F.3d 935-36; *Stephens*, 402 B.R. at 4-6. The Court terms this the state-specific interpretation. Finally, the third view, which a few courts have endorsed, holds that a state's exemption laws may be applied to non-residents and to out-of-state property, regardless of whether that state's laws allow for such extraterritorial effect or not. *See, e.g., Garrett*, 435 B.R. at 451-52.[2] The interpretation has been termed the preemption view. *See* Laura B. Bartell, *The Peripatetic Debtor: Choice of Law and Choice of Exemptions*, 22 Emory Bankr. Dev. J. 401, 417, 420.

The bankruptcy court, establishing and following the first view, refused to allow Debtor to use Nevada exemption law, regardless of whether Nevada law allows for extraterritorial effect or not. *See Fernandez*, 445 B.R. at 816. The Court disagrees, and believes the state-specific approach is the correct one, finding it more persuasive than both the anti-extraterritoriality and

---

[2]  There is a variant of the third view that would give extraterritorial effect to a state's law without regard to the state's intent, but only inasmuch as it is substituted for the exemption law of the forum state. Under this approach, the state's laws cannot apply to property located outside the state of the debtor's domicile at filing. *See In re Camp* (*Camp I*), 396 B.R. 194 (Bankr. W.D. Tex. 2008), *rev'd on other grounds*, 631 F.3d 757 (5th Cir. 2011). However, because this view has been advanced by only one court and the outcome under it and the stronger view of preemption would be identical here, the Court does not distinguish between the two in its analysis.

the preemption interpretations. To explain why, the Court proceeds by examining the relative merits of each view.

### 1.    Anti-extraterritoriality interpretation

This first view, which the bankruptcy court below is the only federal court to endorse, holds that a state cannot require another state to give effect to its exemption laws, and consequently that bankruptcy courts may not give extraterritorial effect to any state's exemption laws. In other words, when applying a former domicile state's exemption laws, the bankruptcy court should apply them as if it were a state court of the forum state where the bankruptcy court were located, giving them like effect. *See Fernandez*, 445 B.R. at 798. However, the Court finds the bankruptcy court's premise to be inapposite, so that its conclusion was in error.

The bankruptcy court arrived at the anti-extraterritoriality view after first examining the initial purpose served by state exemption laws. As persuasively explained by the bankruptcy judge below, that purpose was to protect assets of debtors from creditors seeking to enforce judgments:

> A state's interest in enacting exemption laws flows directly from its interest in preserving a minimum amount of property for every debtor, regardless of their level of indebtedness, so that they do not end up becoming a burden on the state, and so that they may preserve a modicum of dignity even in the depths of financial straits. In *Cobbs v. Coleman*, the Texas Supreme Court colorfully stated the purpose thusly:
>
> > No Creditor shall strip from the sacred body of the wife of your bosom, from the tender form of the precious child she bore you, or from your own frame, the clothing you have purchased with your earnings to hide your nakedness and that of your beloved dependents. This unnecessary humiliation shall never be visited upon you, with the consent of the law.
>
> 14 Tex. 594 (1855) . . .

*Fernandez*, 445 B.R. at 795 n.6 (citation omitted).

To protect its citizens from suffering such indignities and prevent them from becoming dependent upon the state government, states enacted exemption laws exempting certain property, such as homesteads, from being used to satisfy a person's debts. *See id.*

The bankruptcy court appears also to be correct that in carrying out these protective policies states have been free to enact whatever exemption laws they wished, and have not had to respect the exemption laws of any other state. While the Full Faith and Credit Clause requires states to give the same effect to a judgment from another state's courts the same effect it would have there, under Supreme Court jurisprudence this has never meant that states were also required to give effect to the other state's exemption laws. *McElmoyle ex rel. Bailey v. Cohen*, 38 U.S. (13 Pet.) 312, 324-25 (1839). A judgment "does not carry with it, into another state, the efficacy of a judgment upon property or persons, to be enforced by execution. To give it the force of a judgment in another state, it must be made a judgment there; and can only be executed in the latter as its laws may permit." *Id.* at 325; *Baker ex rel. Thomas v. General Motors Corp.*, 522 U.S. 222, 235 (1998) ("Full faith and credit, however, does not mean that enforcement measures must travel with the sister state judgment as preclusive effects do; such measures remain subject to the evenhanded control of forum law.") (citing *McElmoyle*, 38 U.S. (13 Pet.) at 325; Restatement (Second) of Conflict of Laws ("Restatement") § 99 (1969)). A creditor cannot directly execute on a judgment from another state, but must instead "domesticate" the out-of-state judgment in some fashion before executing on it. *Adar v. Smith*, 639 F.3d 146, 158 (5th Cir. 2011) ("full faith and credit doctrine does not contemplate requiring an executive officer to 'execute' a foreign judgment without the intermediary of a state court"); *see also* Sara L. Johnson, Annotation, *Validity, Construction, and Application of Uniform Enforcement of*

*Foreign Judgments Act*, 31 A.L.R.4th 706 (1984) (laying out procedure and case law relevant to enforcing foreign state judgments). Thus, because a foreign judgment when executed upon has been converted or incorporated in some sense into a local judgment, a creditor is bound by the local rules on enforcing judgments, and is not bound by the enforcement rules of the state where the judgment originated. *Adar*, 639 F.3d at 159 (state enforcement of foreign judgments must be "evenhanded," meaning that a foreign judgment is enforced in the same way as a local judgment of the forum). In line with these cases, it appears the majority of states have held that they are not required to give effect to another state's exemption laws. *See* 35 C.J.S. *Exemptions* § 6 (2011); Bartell, *supra*, at 416 & n.103 (citing *DeLotel v. DeLotel* (*In re Marriage of DeLotel*), 140 Cal. Rptr. 553, 555 (Cal. Ct. App. 1977); *Garrett v. Garrett*, 490 P.2d 313, 315 (Colo. App. 1971); *Mahl v. Aaron*, 809 N.E.2d 953, 957 (Ind. Ct. App. 2004); *Ferneau v. Armour & Co.*, 303 S.W.2d 161, 167 (Mo. Ct. App. 1957); *Goodwin v. Claytor*, 49 S.E. 173, 174 (N.C. 1904); *State ex rel. Lankford v. Collins*, 174 P. 568, 570 (Okla. 1918); *Carson v. Memphis & C.R. Co.*, 13 S.W. 588, 589 (Tenn. 1890); *Bergman v. Bergman*, 888 S.W.2d 580, 582 (Tex. App. 1994); *Strawn Mercantile Co. v. First Nat'l Bank of Strawn*, 279 S.W. 473, 474 (Tex. App. 1925); *Wm. Cameron & Co. v. Abbott*, 258 S.W. 562, 564 (Tex. App. 1924); *S. Pac. Co. v. I.X.L. Furniture & Carpet Installment House*, 140 P. 665, 666 (Utah 1914)).

But, and this is where the Court parts ways with the bankruptcy court's argument that state laws may never have extraterritorial effect, there is a crucial difference between a state being *required* to give effect to another state's exemption laws and a state being *allowed* to give effect to another state's exemption laws. That a state is prevented from imposing its laws on another state does not mean that a state may not offer its laws for use by another state, if that

other state so wishes, or that a state may not, in actions brought in its own courts, apply its own state law to property located elsewhere. *See In re McWilliams*, 296 B.R. 424, 426 (Bankr. E.D. Va. 2002) (applying Virginia homestead exemption statute with procedure for application to property located outside the state).

Authorities enunciating the general principle of no required extraterritorial effect recognize this point, since it has long been the rule that a state may give effect to another state's laws when its own rules of comity require it. *See, e.g.*, 35 C.J.S. *Exemptions* §§ 6-7 (2011) ("If it is determined that the exemption policies of the two states are congruous, the exercise of comity will not be defeated merely because the amount of exemption provided for by each differs."); *DeLotel*, 140 Cal. Rptr. at 555 ("where the exemption laws of both states are practically the same, the exemption law of the foreign state will be granted comity"); *Ferneau*, 303 S.W.2d at 167 ("Nor can defendant *as a matter of right* avail himself here of [another state's exemption laws]," but "as a voluntary act of courtesy and good will under the rule of comity, the courts of this state will recognize and enforce the exemption laws of a sister state where the general policy of the two states is the same.") (emphasis in original). Indeed, in a seeming expansion of the rule of comity, the Restatement provision dealing with choice of exemption law provisions actually requires recognition of another state's exemption laws when another state has the dominant interest:

> The local law of the forum determines what property of a debtor within the state is exempt from execution unless another state, by reason of such circumstances as the domicil of the creditor and the debtor within its territory, has the dominant interest in the question of exemption. In that event, the local law of the other state will be applied.

Restatement § 132; *see also Bergman*, 888 S.W.2d at 585-86 (applying the Restatement rule); *In re Pederson*, 105 B.R. 622, 624 (Bankr. D. Colo. 1989) (applying the Restatement rule to select

exemption law in bankruptcy proceeding).

Thus, the authorities cited by the bankruptcy court do not support the proposition that state laws are always and necessarily local in nature. States have always been free to give effect to other states' exemption laws, and have occasionally done so.

This conclusion is unremarkable on its face, since it is in accord with longstanding conflict of law principles. Under contractual choice of law clauses or under a state's choice of law rules, any state can give effect to another state's laws when it chooses to do so. *See, e.g.*, Restatement § 6 (listing factors to apply when deciding which state's substantive law should apply when there is no statutory choice of law rule); *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008) (applying Texas's choice of law rules, which follow the Restatement, and deciding Louisiana law should apply); *Castro v. Budget Rent-A-Car System, Inc.*, 65 Cal. Rptr. 3d 430, 441-44 (Cal. Ct. App. 2007) (applying California's "governmental interest analysis" choice of law rule and deciding Alabama tort law should apply); *Flint v. Liberty Ins. Corp.*, 613 F. Supp. 2d 899, 902-03 (E.D. Ky. 2009) (applying Kentucky's choice of law rules, which follow the Restatement, and deciding Indiana law should apply). The only limitations on the application of another state's laws are the "modest restrictions" imposed by the Due Process and Full Faith and Credit Clauses, which require only that a state "have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (quotation omitted).

The bankruptcy judge below found that an attempt to apply a state's exemption laws extraterritorially was a wild goose chase, since it would entail giving extraterritorial effect to a

law that was only designed for application within a state. *Fernandez*, 445 B.R. at 798 n.12. As the bankruptcy judge put it, because states cannot require each other to apply their exemption laws, "it is unnecessary (perhaps even misleading) to examine whether a given state's exemption law is intended to apply extraterritorially, or whether a given state's law is silent with regard to its extraterritorial application. Courts that go down this road are on a snipe hunt, because the question itself is irrelevant." *Fernandez*, 445 B.R. at 798 n.12; *cf. In re George*, 440 B.R. 164, 166 (Bankr. E.D. Wis. 2010) (holding that it was "implied by the structure and function of the applicable statutes" that Illinois exemption laws had exclusively in-state effect). However, the same argument applies to application of any state law through a choice of law rule, and that does not prevent states from doing so. The drafters of the Restatement recognized the problem, noting, "Legislatures usually legislate, and courts usually adjudicate, only with the local situation in mind. They rarely give thought to the extent to which the laws they enact, and the common law rules they enunciate, should apply to out-of-state facts." Restatement § 6 cmt. b. But rather than viewing this as a basis for refusing to give extraterritorial effect to state laws, the drafters instead concluded that the general inattention of legislatures and courts meant a more fact-intensive inquiry was necessary for deciding which state's law should apply. *Id.*

Besides the flaws in the bankruptcy court's analysis of the potential extraterritorial effect of a state's laws, the Court finds three other defects in the anti-extraterritoriality interpretation. First, the analysis focuses entirely on the question of whether a state's exemption laws can apply to out-of-state property, but does not address at all the equally significant issue of whether a state's exemption laws can apply to out-of-state residents. If a state's exemption laws cannot apply to out-of-state property because only parties to a state judgment execution could invoke

them, the same laws are equally inapplicable in other types of actions to out-of-state parties for the same reason. In both situations the law would have to be stretched to encompass a context never intended by the drafters, and would be applied to factual settings over which the state could not require its laws be given effect. Following this argument into the bankruptcy context, it would mean that every debtor who changed his domicile within two years of filing a petition would be forced to use state exemption laws that could by definition *never* apply to him or any of his property. Where a given interpretation of a statute leads to an absurd result such as this, it cannot be the correct one. *See Murphy*, 548 U.S. at 296-97 ("When the statutory language is plain, the sole function of the courts—*at least where the disposition required by the text is not absurd*—is to enforce it according to its terms.") (emphasis added) (quotation omitted).

Second, this approach reads part of the language right out of the statute. If a debtor has moved from a state and is now domiciled in another state where he has been required to file his bankruptcy petition, it is likely that most if not all of his property is located in his new state of residence. However, this reading would indicate that in these types of scenarios, the most common types of scenarios, the complicated inquiry into the debtor's state of domicile up to 910 days prior to the petition would be meaningless, since the debtor would never be able to claim that state's exemptions. The only debtors who could make any use of the exemptions of their former state of domicile would be debtors who still owned property in that state. Moreover, even debtors holding property in their former state would still be non-residents, and as just explained, under the logic of the anti-extraterritoriality interpretation, it is doubtful that a state's exemption laws are any more applicable to out-of-state debtors than they are to out-of-state property. Thus, under this reading, any debtor who has not resided in his current state of domicile for at least 730

days would not be able to use any state exemptions, and would only be able to use the federal exemptions. If that were truly Congress's intent, it could have simply said as much, without this more elaborate procedure; because this interpretation seems to make so much of the statute irrelevant, it cannot be correct. *See Waggoner*, 488 F.3d at 636 (courts must interpret statutes "so as to give effect to each of [their] provisions without rendering any language superfluous") (quotation omitted).

Third, § 522(b)(2) requires application of state opt-out law to determine if a debtor may use the federal exemptions. Specifically, the statute states that the federal exemptions are available "unless the State law that is applicable to the debtor under paragraph (3)(A) specifically does not so authorize." 11 U.S.C. § 522(b)(2). But in the bankruptcy court's view, there is no state law that would ever be "applicable" to a debtor under paragraph (3)(A), so there is no state law to use to make this determination. With no state opt-out law to apply and with state exemptions always unavailable under the bankruptcy court's view, the debtor is left with a Hobson's choice between the federal exemptions or no exemptions at all. While this is not an absurd result, since the debtor still gets the use of the federal exemptions, it does make the hanging paragraph superfluous. After all, the hanging paragraph is designed for situations in which state opt-out law prevents a debtor from using federal exemptions, while state exemption law requirements prevent a debtor from using state exemptions because the debtor or the property is located out of state. But if opt-out laws can never apply because no state law under paragraph (3)(A) will ever be applicable, then debtors can always get the protection of the federal exemptions simply because it is the only choice available to them, and there would never be a reason to have recourse to the hanging paragraph to exempt property. *Cf. George*, 440 B.R. at

166 (finding a debtor entitled to federal exemptions either because an opt-out law did not apply extraterritorially or because state exemption laws did not apply extraterritorially). The Court cannot endorse a reading of the statute that makes some of its language superfluous. *See Waggoner*, 488 F.3d at 636 (courts must interpret statutes "so as to give effect to each of [their] provisions without rendering any language superfluous") (quotation omitted).

### 2. State-specific interpretation

The second interpretation holds that a state's exemption laws may be used by out-of-state debtors for out-of-state property to the extent that each state's exemption law permits. Generally, under this approach, if the state's exemption statutes or decisional authority interpreting them do not explicitly limit the use of the exemptions to in-state residents or to in-state property, then the bankruptcy court should apply the state's exemption laws to a debtor's property, wherever located. *See Stephens*, 402 B.R. at 6. The Court finds this is the approach Congress intended and applies it here. The Court does so for three reasons. First, the weight of authority supports this position. Second, this approach is in line with the recent decision of the Fifth Circuit on the closely analogous question of extraterritorial effect of state opt-out laws. Third, and most importantly, it is a plausible interpretation of language of the statute that gives full effect to all of the statutory language, especially when considered in light of the purpose of the BAPCPA amendments.

### a. Weight of authority

The majority of courts to address the issue of extraterritorial application of state exemption laws have adopted the state-specific view, and looked to state law to determine whether the exemption may apply extraterritorially. *Garrett*, 435 B.R. at 439 (describing the

20

state-specific interpretation as the majority position).  The Court has reviewed the extensive case law, and it appears that this is not merely the majority position, but the majority position by a considerable margin.  Of the forty bankruptcy court or district court cases that the Court has found which address whether and how to apply a state's exemption laws to out-of-state property or debtors, thirty-six of them have looked to state law to decide the question.[3]  Additionally, three of the four cases decided by Circuit Courts of Appeals or Bankruptcy Panels of Circuit Courts of Appeals have taken this position.  *See Stephens*, 402 B.R. 1; *In re Drenttel*, 403 F.3d 611 (8th Cir. 2005); *Arrol*, 170 F.3d 934.

The rationale of these courts is somewhat varied, and some, especially the earliest case, simply interpret the statute in this way without explanation.  *See, e.g.*, *Cappetta*, 33 B.R. at 756-

---

[3]    *See In re Stephens* ("*Stephens II*"), No. 10–41450–JDP, 2011 WL 1790777 (Bankr. D. Idaho May 10, 2011); *In re Roberts*, --- B.R. ----, 2011 WL 1760283 (N.D. Iowa 2011); *In re Beckwith*, 448 B.R. 757 (Bankr. S.D. Ohio 2011); *George*, 440 B.R. 164; *In re Capps*, 438 B.R. 668 (Bankr. D. Idaho 2010); *Arrendondo-Smith*, 436 B.R. 412; *In re Harris*, No. 09–03792, 2010 WL 2595294 (Bankr. D. Idaho June 23, 2010); *Bierbach v. Brooks* (*In re Brooks*), 393 B.R. 80 (Bankr. M.D. Pa. 2008);  *In re Jevne*, 387 B.R. 301 (Bankr. S.D. Fla. 2008); *Bingham*, 2008 WL 186277; *In re Katseanes*, No. 07–40168–JDP, 2007 WL 2962637 (Bankr. D. Idaho, Oct. 9, 2007); *In re Adams*, 375 B.R. 532 (Bankr. W.D. Mo. 2007); *In re Nickerson*, 375 B.R. 869 (Bankr. W.D. Mo. 2007); *Williams*, 369 B.R. 470; *In re Schlakman*, No. 05–36921–BKC–PGH, 2007 WL 1482011 (Bankr. S.D. Fla. Jan. 16, 2007; *In re Tate*, No. 06–61718 FRA7, 2007 WL 81835 (Bankr. D. Or. Jan. 8, 2007); *Battle*, 366 B.R. 635; *In re West*, 352 B.R. 905 (Bankr. M.D. Fla. 2006); *In re Jewell*, 347 B.R. 120 (Bankr. W.D.N.Y. 2006); *In re Crandall*, 346 B.R. 220 (Bankr. M.D. Fla. 2006); *Underwood*, 342 B.R. 358; *In re Morris*, 340 B.R. 78 (Bankr. W.D. Ark. 2006); *In re Woodruff*, No. 04–63288, 2005 WL 1139891 (Bankr. W.D. Mo. Apr. 28, 2005); *In re Bausback*, No. 02–0825–WH, 2003 WL 25932295 (Bankr. S.D. Iowa June 3, 2003); *McWilliams*, 296 B.R. 424; *In re Ginther*, 282 B.R. 16 (Bankr. D. Kan. 2002); *In re Weza*, 248 B.R. 470 (Bankr. D.N.H. 2000); *In re Stratton*, 269 B.R. 716 (Bankr. D. Or. 2001); *In re Carter*, 213 B.R. 26 (Bankr. N.D. Ala. 1997); *In re Halpin*, No. 93–03215, 1994 WL 594199 (Bankr. D. Idaho Nov. 1, 1994); *In re Sipka*, 149 B.R. 181 (D. Kan. 1992); *In re Bloedon*, 137 B.R. 824 (Bankr. D. Colo. 1992); *Schulz*, 101 B.R. 301; *In re Sanders*, 72 B.R. 124 (Bankr. M.D. Fla. 1987); *Calhoun*, 47 B.R. 119; *In re Cappetta*, 33 B.R. 755 (Bankr. E.D. Va. 1983).

57.  But the most common approach is patterned after *Arrol*, the seminal Ninth Circuit case that

first adopted this view, and *Drenttel*, the Eighth Circuit opinion that followed *Arrol*.  Courts

taking this approach begin with the proposition that § 522 is itself a choice of law statute, so that

it is unnecessary and duplicative to look to state choice of law rules when deciding what state's

exemptions to apply.  *Stephens*, 402 B.R. at 5; *Drenttel*, 403 F.3d at 614; *Arrol*, 170 F.3d at 935;

*see also Calhoun*, 47 B.R. at 122 (describing, pre-*Arrol*, § 522(b) as a choice of law statute);

*contra Pederson*, 105 B.R. at 624-25 (looking to state choice of law principles to see which

exemptions should apply).  Following this, the courts then examine the state's exemption law,

since that is the law the federal choice of law rule has selected.

Under this view, courts should begin with the state constitution as the primary authority

of state law.  *Stephens*, 402 B.R. at 5; *Adams*, 375 B.R. at 534.  If the constitution is silent with

regard to the availability of the claimed exemption to out-of-state debtors or property, then the

courts should look to statutory law.  *Stephens*, 402 B.R. at 6; *Arrol*, 170 F.3d at 936.  If a court

finds no answer there, it should turn to the decisions of the state's courts to see whether the

exemption law should have extraterritorial effect.  *Stephens*, 402 B.R. at 6; *Drenttel*, 403 F.3d at

615; *Arrol*, 170 F.3d at 936;  *Adams*, 375 B.R. at 534.  If, after all of these inquiries, the courts

find no direct evidence of the state's position on extraterritoriality, they typically infer from the

silence that the laws should have extraterritorial effect, since state law usually indicates that

exemption laws are to be liberally construed.  *Stephens*, 402 B.R. at 6-7 ("Given the fact that

most, if not all, state courts generally require homestead exemptions to be liberally construed in

favor of debtors, it is very likely that a state's homestead exemption will be given extraterritorial

effect absent a limitation placed on the exemption by either the statute itself, or a case

interpreting that statute."); *Drenttel*, 403 F.3d at 614; *Arrol*, 170 F.3d at 935; *but see Jevne*, 387 B.R. at 304-05 (describing some contrary authority, though ultimately concluding that silence should be construed in favor of extraterritoriality); *contra George*, 440 B.R. at 166 (construing silence in state law against extraterritorial interpretation, in light of the "structure and function" of the exemption laws).

Now, to be sure, many of the courts that have looked to a state's law to determine whether that state's exemptions apply to former residents or out-of-state property have concluded, based on that state's law, that they do not. *See, e.g.*, *Adams*, 375 B.R. at 534-35; *Jewell*, 347 B.R. at 122-23; *Carter*, 213 B.R. at 32 n.1. In fact, it appears that the majority of states restrict their laws to in-state debtors or property. Brown et al., *supra*, § 4:6 (describing the extraterritoriality of most states' laws). But regardless of the exact content of the state law or how courts go about determining it, that bankruptcy courts look to state law when deciding which exemptions apply is what is significant. One prominent treatise's treatment of the issue acknowledges this, flatly stating that when a debtor is required by § 522(b) to apply the exemption law of his former state of domicile, courts "must give effect to those exemptions allowed by the law of the state" and that "it makes no difference where the property is situated or where the petition is filed, so long as the property is exempt under the law of the domiciliary state." 4 *Collier on Bankruptcy* ¶ 522.06 (Alan N. Resnick & Henry J. Sommer eds.-in chief, 16th ed. rev. 2007). The treatise goes on to note a split in the case law on how to precisely determine whether property located out of state would be exempt, but it does not question the fact that the inquiry should focus on the content of state law. *Id.*

Critics of the state-specific interpretation have argued that by "import[ing] state

exemption laws wholesale, including limitations based on residency or location of property, [it] can lead to some absurd results." *See Camp I*, 396 B.R. at 200; *Garrett*, 435 B.R. at 450 (quoting *Camp I*). That is, if bankruptcy courts must look to state law to see whether exemptions are available extraterritorially, what happens when the state law indicates that its own exemptions do not apply, but another state's laws do? *See Camp I*, 396 B.R. at 200 (highlighting the issue). The question is not purely academic, as at least two states have this kind of exemption statute. *See* Idaho Code. Ann. § 11-602 ("Residents of this state are entitled to the exemptions provided by this act. Nonresidents are entitled to the exemptions provided by the law of the jurisdiction of their residence."); Wis. Stat. § 815.18(5) ("A resident is entitled to the exemptions provided by this section. A nonresident is entitled to the exemptions provided by the law of the jurisdiction of his or her residence."). However, this argument is disposed of by the state-specific view's approach of disregarding state choice of law rules when looking at state exemption law. Since the kind of exemption law in force in Idaho and Wisconsin is in effect a state choice of law rule, as opposed to a requirement that applies only to the availability of that state's exemption laws, bankruptcy courts should disregard this type of provision in state statutes when examining state exemption law. *See Stephens*, 402 B.R. at 5; *Drenttel*, 403 F.3d at 614; *Arrol*, 170 F.3d at 935.

**b.    *In re Camp***

This majority support for the state-specific interpretation is consistent with the approach the Fifth Circuit has taken on the closely analogous question of whether to give state opt-out laws extraterritorial effect. As described above, § 522 states that one must look to the debtor's former state of domicile to determine which state exemptions may apply, but also says that that state can opt out of the federal exemptions and restrict debtors to its state exemptions. 11 U.S.C. § 522(b).

In several recent cases, courts have confronted the issue of whether and how to apply the opt-out laws of a debtor's former state of domicile. Just as they have on the extraterritoriality of state substantive exemption laws, they have split on the question of how to apply a state's opt-out law to a debtor who is only applying the state's exemption laws because of § 522(b). *See, e.g.*, *In re Battle*, 366 B.R. 635, 636 (Bankr. W.D. Tex. 2006) (not applying a Florida opt-out statute because it was limited by its literal language to residents); *Williams*, 369 B.R. at 474 (applying Iowa's opt-out statute to non-residents because it was not limited by its terms to residents); *Camp I*, 396 B.R. at 200 (finding Florida opt-out residency restriction preempted by bankruptcy law).

The Fifth Circuit has recently taken a side in this split, holding in *Camp II* that one must look at the precise language of the relevant opt-out statute to see whether it "specifically" applies to former residents. *Camp II*, 631 F.3d at 760. The Florida statute at issue in *Camp II* stated, "'In accordance with the provisions of [11 U.S.C. § 522(b)], *residents of this state* shall not be entitled to the federal exemptions provided in [11 U.S.C. § 522(d)].'" *Id.* (quoting Fla. Stat. Ann. § 222.20) (alterations and emphasis in original). Based on the precise language stating that it only applied to "residents of this state," the court held that the opt-out provision was not applicable to former residents, and thus that former residents who were forced to use Florida exemption law because of the 730 day domicile requirement of § 522(b)(3)(A) could freely choose the federal exemptions if they so desired. *Id.*; *see also In re Chandler*, 362 B.R. 723, 726-27 (Bankr. N.D. W. Va. 2007) (holding similarly for Georgia opt-out statute); *In re Underwood*, 342 B.R. 358, 361–62 (Bankr. N.D. Fla. 2006) (same for Colorado law).

The Fifth Circuit foresaw the corollary issue of extraterritorial reach of substantive exemption laws, which faces the Court today, but explicitly reserved judgment on it. *See Camp*

*II*, 631 F.3d at 761 n.3.  The court specifically noted,

> We do not reach the corollary questions of (1) whether the choice-of-law
> provision in § 522(b)(3)(A) preempts state-law restrictions on the extraterritorial
> application of state-law exemption schemes, and (2) whether the "savings clause"
> in the hanging paragraph at the end of § 522(b) permits debtors to claim the
> federal exemptions when the applicable state law opts out of the federal
> exemption scheme and, at the same time, restricts the extraterritorial application
> of the state-law exemption scheme, thereby rendering both exemption schemes
> unavailable to the debtor through the normal operation of the Bankruptcy Code.

*Id.* (citations omitted).

Nonetheless, despite this reservation, the Court finds *Camp II* to be persuasive authority for the

state-specific interpretation.  The Fifth Circuit did not look at the historical reasons why states

enacted opt-out laws and try to divine whether, in light of those reasons, bankruptcy courts

should try to apply an opt-out law to out-of-state debtors.  Nor did it find the reach of state opt-

out laws to be preempted by § 522(b) and the BAPCPA amendments.  Instead, the Fifth Circuit

simply looked to the statutory language of Florida's opt-out law to determine its reach.  The

Court takes the same approach to the related issue of extraterritoriality of exemption laws.

It seems unlikely on its face that Florida purposefully legislated with an eye to how its

opt-out statute would affect non-residents forced to use Florida exemption laws by

§ 522(b)(3)(A), just as it seems unlikely here that Nevada was considering how its exemption

laws could be applied to out-of-state debtors or property when it enacted them.  But the Fifth

Circuit in *Camp* brushed aside such concerns, noting that Florida's opt-out statute was enacted in

1979, and that there had been the potential for a conflict between state residency and state opt-out

laws since 1978, when Congress first set a 180 day look-back for determining a debtor's

domicile.  *Camp II*, 631 F.3d at 761.  The court found that Florida's failure to amend its statute in

the face of this potential conflict indicated an intent to only opt out of the federal exemptions for

Florida residents.  *Id.*  This reasoning supports the approach the Court takes today, albeit with diminished force.  Here, Nevada has had approximately five years after the passage of BAPCPA to amend its exemption laws to take into account the potential for them to be applied to former residents or to out-of-state property.  It has not done so.  Thus, it is not a "snipe hunt" to look at the language of Nevada's exemption statutes to see whether they should apply to non-residents or out-of-state property.

### c.    Statutory language

The Court finds the state-specific interpretation especially persuasive because it is a natural reading of the statute and gives meaning to all of the statutory language.  The text of § 522(b) is not the most straightforward of statutes and is susceptible to multiple different readings:

> (1) . . . [A]n individual debtor may exempt from property of the estate the property listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection . . . .
>
> (2) Property listed in this paragraph is property that is specified under [the federal bankruptcy law exemptions], unless the State law that is applicable to the debtor under paragraph (3)(A) specifically does not so authorize.
>
> (3) Property listed in this paragraph is--
> > (A) . . . any property that is exempt under Federal law, other than [the federal bankruptcy law exemptions], or State or local law that is applicable on the date of the filing of the petition to the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition or if the debtor's domicile has not been located in a single State for such 730-day period, the place in which the debtor's domicile was located for 180 days immediately preceding the 730-day period or for a longer portion of such 180-day period than in any other place;
>
> > . . . .
>
> If the effect of the domiciliary requirement under subparagraph (A) is to render the debtor ineligible for any exemption, the debtor may elect to exempt property

27

that is specified under subsection (d) [the federal exemptions].
11 U.S.C. §522(b).

Reduced to the essence relevant here, the state exemption portion of the statute says that a debtor may claim as exempt, property that is exempt under state law that is applicable to the debtor's former state of domicile. The state-specific interpretation gives this language its most natural and literal effect: whatever is exempt under state law is exempt in bankruptcy. Because § 522(b) does not restrict or give a broader reach to the state exemption statutes, they retain whatever reach they have as a matter of state law. If a state wants to restrict the availability of exemptions to non-residents or to out-of-state property, then the bankruptcy law will honor that policy choice. *See Jewell*, 347 B.R. at 122-23 (holding that the language of the statute requires that state law be "applicable," which gives effect to state territoriality requirements preventing an exemption law from being applicable). This makes sense, since it is state law that defines the property interests in bankruptcy, *see Butner v. United States*, 440 U.S. 48, 55 (1979), and courts have held that to claim property as exempt under state or local laws, "'it must be claimed as exempt in the manner prescribed by those laws.'" *Beckwith*, 448 B.R. at 765 (quoting *Zimmerman v. Morgan (In re Morgan)*, 689 F.2d 471, 472 (4th Cir. 1982)).

Unlike the first view, where the look-back language in § 522(b)(3)(A) is surplusage that calls for a pointless inquiry into the debtor's former state of domicile, under the second view there are many situations where a debtor could actually make use of the exemptions of his former state of domicile. The number of such situations is fluid; this interpretation means states are free to change their exemption laws to loosen or restrict the availability of their exemption laws, and the bankruptcy statute will automatically take those changes into account. *See United States v.*

*Sharpnack*, 355 U.S. 286, 293-97 (1958) (holding it a constitutional delegation of Congress's power to incorporate state laws by reference, even when those laws have not yet been enacted, and citing bankruptcy law's treatment of state exemption laws as a permissible example of doing so). And for those states that choose to restrict the availability of their state exemptions for whatever reason, the hanging paragraph is there to prevent any debtors from being unable to claim any exemptions at all. Unlike the first view, through the state-specific interpretation the hanging paragraph serves the purpose it appears designed for—as a gap-filler provision, rather than the dominant exemption selection rule.

While the Court finds this interpretation of § 522 to be more persuasive than either of the alternatives, the Court acknowledges two counter-arguments cast it into some doubt. First, while the statutory language and decisional authority conclusively indicate what Congress's intent was behind the statute, they do nothing to illuminate why Congress had that intent. That is, the reasoning behind states' restrictions on extraterritorial application of exemption laws is not clear, and Congress's rationale for respecting those restrictions even less so. States could conceivably treat debtors and property located in state differently from debtors and property located out of state, since local debtors and property will in all likelihood have more effect within the state. *See Camp II*, 631 F.3d at 761 (finding such a concern to underlie a state opt-out law that treated residents and non-residents differently). However, given that it costs states nothing to extend the reach of their policies through bankruptcy law to property and debtors located out of state, and that other states can have no complaint when they do so because it is Congress's policy that makes it possible, it is hard to understand why states would voluntarily prevent their policies from having a slightly wider reach. With the rationale behind states' territoriality restrictions

being unclear, it is doubly difficult to discern why Congress would respect those restrictions enough to give them effect in bankruptcy law, when the result is that a debtor who has moved between states in the two years prior to filing his petition will be treated differently than a debtor who has not moved. *See Garrett*, 435 B.R. at 449-50 (noting how, under a non-preemption interpretation, debtors who move may either receive a choice between state and federal exemptions if an opt-out law does not apply, or lose the benefit of state exemptions and be forced to rely on federal exemptions if the state exemptions have territoriality restrictions). Were the case law and language of the statute less conclusive the Court would be troubled by this absence of a clear policy justification for the state-specific interpretation. But since the statute, as written, clearly reflects the congressional intent, the Court must check its concerns and give effect to Congress's will.

Second, the Court is sensitive to the bankruptcy court's argument that looking to state law for extraterritorial effect gives outsized significance to choices of drafting language that might have been entirely unintentional. *See Fernandez*, 445 B.R. at 798 n.12 (characterizing the inquiry as a "snipe hunt"). However, this appears to be the result Congress intended, as set forth above. Additionally, state exemption laws are not static fixtures; state legislatures can and do change their laws in this area to take into account changes in how bankruptcy law would give them effect. *See Stephens II*, 2011 WL 1790777, at *3 n.6 (noting that the "Idaho legislature has on multiple occasions amended or clarified Idaho's exemption laws in obvious response to the decisions of" that court). Thus, even if states' exemption laws' allowance of or restrictions on extraterritorial effects are more the result of choices of language that seemed inconsequential at the time, states are free to amend their exemption laws to take into account the possibility of their

30

having extraterritorial effect in bankruptcy proceedings. *See Camp II*, 631 F.3d at 761 (finding the absence of amendments to indicate a tacit acquiescence to the interpretation of an opt-out law as restricted to state residents). Indeed, states have been free to make such changes for many years, since the extraterritorial issue is not a new one. *See Stephens II*, 2011 WL 1790777, at *3 n.6 (observing that the court first confronted the issue of extraterritoriality of Idaho exemption laws in approximately 1994); *Arrol*, 170 F.3d 934 (decided more than ten years ago, in 1999).

### 3.    Preemption interpretation

The third interpretation of § 522(b) is the most straightforward and facially appealing, and addresses the potential shortcoming of the state-specific interpretation mentioned above. This interpretation would hold that § 522(b) is a choice of law rule that incorporates state exemption law by reference. And because choice of law rules in general work to give extraterritorial effect to a state's laws without regard to the state's intent for them to have such effect, state exemption laws should be applied to any debtor and any property, wherever located, whenever § 522(b) calls for it. As some have phrased it, this views § 522(b) as totally preempting any state restrictions on the applicability of state exemption laws. *See* Bartell, *supra*, at 417, 420. While this view is a sensible interpretation of the statute on its face, it is the minority position, *see* Brown et al., *supra*, § 4:5, and the Court finds it ultimately unpersuasive because it is not the most reasonable interpretation of the statute and fails to give meaning to all of the statutory language.

The case for preemption is straightforward, and proceeds from the same premise as the second view, the principle that § 522(b) is a choice of law statute. *See Camp I*, 396 B.R. at 202. When a choice of law rule requires the application of another state's law, that law is defined as

31

"'the body of standards, principles and rules, exclusive of its rules of Conflict of Laws, which the courts of that state apply in the decision of controversies brought before them.'" Bartell, *supra*, 411 (quoting Restatement § 4). States applying another state's laws generally do not apply the other state's choice of law rules, else the courts might find themselves caught in endless loops of reference to another state's laws, which refer to yet another state's laws, and so forth. *Cf.* Restatement § 8 (treating the issue of when and how courts should look to another state's choice of law rules). According to the preemption view, territoriality or residency requirements in a state's substantive laws are equivalent to a form of choice of law rule, and so should be equally disregarded when applying that state's law under choice of law rules. *Camp I*, 396 B.R. at 199.

Just as states' choice of law rules or private contracts can require the application of a certain state's laws without any issues of extraterritoriality coming into play, so too can Congress choose to have a certain state's exemptions laws apply, either as a matter of preemption under the Bankruptcy Clause or more simply as a choice of law issue. Bartell, *supra*, at 417. That is, if "§ 522(b)(3) gives state exemption laws extraterritorial effect, it does so as a matter of federal law." *Id.* Because state statutes are being incorporated by reference into the federal legislation, the exemptions being applied are ultimately federal ones. *Cf. Bartlett v. Giguere* (*In re Bartlett*), 168 B.R. 488, 494 (Bankr. D.N.H. 1994) ("the exemption right that we are dealing with in these cases is created by federal law, and is a matter of federal law as to applicability, even though the amount and items of exemption are defined and set forth in existing state statutes"). As stated by the Sixth Circuit, "[C]oncerns regarding extraterritorial effects of state law are misplaced. Section 522(b) is a federal statute which has incorporated state law into its application. Upon incorporation, state law became a part of the federal statutory scheme; so it is federal law being

given effect, not state law." *Farinash v. Stockburger* (*In re Stockburger*), 106 F.3d 402, *2 (6th Cir. 1997) (table decision) .

### a.       Basis for preemption

This line of argument appears to be a sensible approach to the issue of state exemptions and a populace of debtors who change their domiciles with increasing frequency. *See Fernandez*, 445 B.R. at 814 & n.40 (citing Bartell, *supra*, at 401) (discussing the rising numbers of Americans who move from one state to another each year). The preemption approach can be troublesome, though, as there is no clear basis in the statute's history and purpose or general preemption analysis principles for preempting state extraterritoriality requirements.

Preemption proponents and opponents have attempted to argue in favor of or against preemption based on a perceived overarching purpose for the inclusion of state exemptions in federal bankruptcy. *See, e.g.*, *Fernandez*, 445 B.R. at 799-802. They have tried to find this purpose from the history of bankruptcy legislation in the United States and from suppositions as to whether bankruptcy law in general, and the exemption laws in particular, are intended to defer to the states or take power away from them. *See id.*; Bartell, *supra*, at 402-07; *Stephens*, 402 B.R. at 5; *Garrett*, 435 B.R. at 446-50. The Court declines to wade into this morass, finding no clear answers as to whether Congress's general aim was to defer to states' exemption laws or to supplant them with federal bankruptcy law. The bankruptcy laws are, like most legislation, a balance between competing policies, and the Court cannot say that one policy dominates over the others. *See Owen*, 500 U.S. at 313 ("it is not inconsistent with the policy of permitting state-defined exemptions to have another policy disfavoring waiver of exemptions, whether federal- or state-created"). The Tenth Circuit's succinct conclusion in *Stephens* that "Congress's

33

intent in allowing states to opt out of the federal exemption scheme is not entirely clear, since the provision was the result of a legislative compromise" is perhaps the best that can be said on this topic. 402 B.R. at 5 n.16. There is insufficient evidence of Congressional intent to either defer to or override states' exemption laws for this Court to use in favor of or against a preemption interpretation of § 522(b).

While there is clear evidence as to Congress's purpose behind the BAPCPA amendments, it is difficult to conclude from this purpose that Congress intended to preempt state law. One of the primary purposes of BAPCPA was to discourage forum-shopping. *Urban*, 375 B.R. at 889 (citing H.R. Rep. No. 109-31, pt. 1, at 15-16 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 102). But there is no evidence of how Congress intended this to be achieved. The *Garrett* court and Professor Bartell ascribe to Congress the intent to return affairs to the status quo ante, by returning debtors to the exemptions that would have applied to them but for their move. *See Garrett*, 435 B.R. at 449; Bartell, *supra*, at 419-20. This purpose would argue in favor of preemption, since it would prevent the states' exemption law requirements from interfering with the process of recreating the status quo ante. However, the legislative history cited by the *Garrett* court to support this intended method contained the views of the dissenting members of Congress, and even the *Garrett* court admitted that courts do "'not usually accord much weight to the statements of a bill's opponents.'" *Garrett*, 435 B.R. at 447 (quoting *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 30 (1988)). Without further evidence of an intent to preempt state exemption territoriality requirements through the BAPCPA amendments, the Court does not find the argument in favor of preemption based upon BAPCPA credible.

Preemption analysis is of little help, either, in determining whether Congress intended to

defer to states' definition of their exemptions or preempt any extraterritoriality limitations. Preemption can take one of three forms: express, implied from occupation of the field, and conflict. *Castro v. Collecto, Inc.*, 634 F.3d 779, 785 (5th Cir. 2011) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985); *Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 1193-94 (2009)). Express preemption arises from explicit statutory language. *Id.* (citations omitted). Implied preemption from occupation of the field arises when federal law is so comprehensive as to leave no room for state law, or the federal interest is so dominant as to preclude enforcement of state law. *Id.* (citations omitted). Conflict preemption arises when compliance with both federal and state law is impossible, or the state law poses an unacceptable obstacle to the enforcement of the federal law. *Id.* (citations omitted).

The Court agrees with the bankruptcy court below that express and implied field preemption do not apply here. *See Fernandez*, 445 B.R. at 808. There is no language in the statute or its history that would support express preemption. As explained above, the purpose behind the BAPCPA amendment to § 522(b) was to prevent debtors from forum-shopping by requiring them to apply the exemption law of their former state of domicile. This purpose does not say anything specifically about Congress' intent to preempt extraterritoriality restrictions in state exemption laws. Regarding preemption implied from occupation of the field, Congress does not appear to have totally occupied the field. After all, even if some states were to restrict their laws, others might let them reach to out-of-state debtors or property; the Court cannot say that Congress intended to so occupy the field of exemption law as to prevent this.

The Court finds express or implied field preemption particularly unlikely because Congress has explicitly deferred to state law in the exemption law area. *See Stephens*, 402 B.R.

35

at 5 ("'Rather than preempting the exemption area, Congress expressly authorizes the states to 'preempt' the federal legislation.'") (alterations omitted) (quoting *Rhodes v. Stewart*, 705 F.2d 159, 163 (6th Cir. 1983)). Rather than restricting debtors to certain federal exemptions, Congress allowed debtors the choice of state or federal exemptions. *See* 11 U.S.C. § 522(b). Moreover, Congress further deferred to state law by allowing states to opt out of the federal exemptions and restrict debtors to only state exemptions. *See id.* Though, as explained above, the Court cannot say this solicitude for state interests is so overwhelming as to completely defeat the preemption argument, the Court does believe that if Congress wanted to defer to state exemption laws in one way but limit them in another it would have made that intent more clear in the legislation. *See Sheevan v. Peveich*, 574 F.3d 248, 252 (4th Cir. 2009) (citing *Rhodes*, 705 F.2d at 163) ("There can be no preemption, however, where Congress "expressly and concurrently authorizes" state legislation on the subject.")). Similarly, the state-specific view, which the Court finds most persuasive, has substantial and relatively longstanding support in the case law that predates the BAPCPA amendments. The Court sees no evidence that Congress intended to overrule this line of case law. *See Bingham*, 2008 WL 186277, at *5 ("nothing in the 2005 revisions to the Bankruptcy Code suggest an intent by Congress to overrule the long line of cases providing that" bankruptcy courts should apply state exemption laws extraterritorially only when those states so permit).

The conflict preemption argument, which both the *Camp I* and *Garrett* courts advanced, is more persuasive, at least with regard to exemption law residency restrictions. Conflict preemption exists "(1) where complying with both federal law and state law is impossible; or (2) where the state law creates an unacceptable obstacle to the accomplishment and execution of the

full purposes and objectives of Congress." *Collecto*, 634 F.3d at 785 (quotation omitted). The entire purpose behind the BAPCPA changes were to require debtors to use exemption laws of states where they necessarily no longer resided. As the Court explained above in its discussion of the anti-extraterritoriality interpretation, this purpose would be substantially thwarted if residency restrictions were allowed to stand. *See Camp I*, 396 B.R. at 197-99; *Garrett*, 435 B.R. at 451-52. If a debtor were restricted from using the exemptions of his former domicile, there would be little point to engaging in the complicated determination of where that debtor's domicile was between 730 and 910 days prior to filing his petition. But while there might be little point in engaging in the inquiry, the *Camp I* and *Garret* courts are not correct that there is no point; Congress's policy would not be entirely thwarted, as indicated by the hanging paragraph. Because that paragraph seems to make provision for just such an eventuality, the Court cannot say that compliance with both state and federal laws would be an impossibility or would be unacceptably impeded. By including that section in the statute, Congress left space for both federal bankruptcy law and state exemption law to be fully enforced to the extent of their terms, which is enough to defeat any claim of conflict preemption.

### b. Hanging paragraph

The hanging paragraph is actually the most persuasive evidence against the preemption interpretation. As one might guess from the fact that the anti-extraterritoriality view gives the hanging paragraph too much emphasis and the state-specific view just enough, the preemption view gives it no role at all. If Congress intended to preempt any and all restrictions in states' exemption laws, whether they were contained in the exemption laws themselves or in the state's opt-out law, then there would be no purpose to the hanging paragraph. If states could not make

37

former resident debtors ineligible for exemptions and unable to choose the federal exemptions, then Congress would not need to provide for exemptions to apply as a fall back.  *See Jewell*, 347 B.R. at 122-23 (finding that the hanging paragraph would be surplusage if the statute, by requiring that the state law be "applicable," did not give effect to state exemption law territoriality requirements).  Professor Bartell frankly acknowledged as much in her article that appears to have been the first authority to espouse the preemption interpretation.  *See* Bartell, *supra*, at 423-24.  She stated that under the preemption interpretation, the hanging paragraph is "unnecessary" and "should never be applicable."  *Id.* at 424.  It being a well-established rule of statutory construction that all words in a statute must have meaning, this is enough to sink the third interpretation.  *See Waggoner*, 488 F.3d at 636 (courts must interpret statutes "so as to give effect to each of [their] provisions without rendering any language superfluous") (quotation omitted).

The court in *Garrett*, attempting to defeat the surplusage argument, set forth several scenarios in which the hanging paragraph would apply.  *See* 435 B.R. at 450-51.  For example, a debtor who recently moved to a new state before filing for bankruptcy, but who had lived in a foreign country during the 180 days preceding the 730 prior to filing, would not be eligible for any exemptions because there would be no former state of domicile to turn to.  *Id.*  Similarly, a debtor who files for bankruptcy soon after immigrating to the United States would not have a former state of domicile to look to for exemption law.  *Id.* at 451.  Finally, a separated but not divorced couple who file for bankruptcy in different states, but whose former state of domicile requires a married couple to use exemptions jointly, would not be eligible for any state exemptions.  *Id.*

Like the *Stephens* court, this Court rejects this argument. *See Stephens*, 402 B.R. at 5 n.18. While the Court appreciates the fact that these scenarios might invoke the use of the hanging paragraph, it does not believe that these scenarios were what Congress had in mind when it enacted BAPCPA and added the hanging paragraph. *See id.* To begin with, debtors who recently relocated to the United States would be eligible to choose the federal exemptions without the hanging paragraph, because, just as there would be no state's exemption laws to apply, there would be no state's opt-out law to apply. *See In re Arispe*, 289 B.R. 245, 248 (Bankr. S.D. Fla. 2002) (prior to BAPCPA, holding a non-immigrant alien debtor eligible to elect the federal exemptions because he was not domiciled in any state during the look-back period, so no state's opt-out law could apply). Also, since the hanging paragraph was added at the same time that the extended look-back provision was introduced into § 522(b)(3)(A), the Court interprets the intent behind the hanging paragraph in light of the extended look-back provision. *See id.* (citing *U.S. West Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1053 (9th Cir. 2000)). Given that the extended look-back provision created an increased potential for a disconnect between current state of domicile and the exemptions available from the former state of domicile, the Court finds it likely that Congress intended the hanging paragraph to address any problems that might arise from that potential disconnect.[4] Thus, even if some of the *Garrett* court's

---

[4]    The Court notes that the history of the BAPCPA legislation and the hanging paragraph also tend to support this argument. The bankruptcy court below argued that the hanging paragraph was the result of a letter from Department of Justice's Office of Legislative Affairs, who believed that "unintended gaps [would] still arise under [the proposed law] as debtors attempt to claim exemptions under the laws of another state in which they no longer reside or have property." *See Fernandez*, 445 B.R. at 815-16 (citing Letter to Representative Henry Hyde from Dennis K. Burke, Office of Legislative Affairs, Dept. of Justice (April 19, 1999), *reprinted at* H.R. Rep. No. 106-123, pt. 1, at 201 (1999)). Besides giving a basis for the inclusion of the hanging paragraph, this letter also supports the state-specific view of the effect of state exemption

scenarios work to prevent the hanging paragraph from becoming surplusage, they do not negate the Court's conclusion that Congress intended the hanging paragraph to alleviate some of the possible harsh effects of state exemption law eligibility requirements.

Finally, the Court notes that, as the *Garrett* court conceded, at present the hanging paragraph saves debtors formerly domiciled in one of at least seven states, who would otherwise be ineligible for any exemptions. *See Garrett*, 435 B.R. at 444 n.13; Brown et al., *supra*, App. C (listing the opt-out rules and extraterritoriality requirements for all the states). The Court finds it much more likely that Congress intended the hanging paragraph to handle the problem posed by seven states' laws than that it intended to aid foreign debtors or debtors recently returning to the United States from foreign countries. Because the hanging paragraph appears intended to assist in the event that a state restricts the extraterritorial effect of its exemptions, the Court finds that the total preemption argument is not persuasive, notwithstanding the existence of other possible scenarios to which the hanging paragraph might apply.

### c. Statutory language

Apart from making the hanging paragraph surplusage, the preemption view also runs aground on the language of the statute. As the bankruptcy court found below, if Congress intended to apply the state exemption laws without reference to their residency or territoriality requirements, it would likely have done so with different language. *See Fernandez*, 445 B.R. at 812. As currently written the statute uses the vague formulation that exempt property "is any

---

law eligibility requirements, as it implicitly acknowledges that some states might restrict the availability of their exemptions while others might not. However, because the letter was sent in reference to a proposed statute that predated the statute ultimately enacted by several years, and because the Court has doubts as to the persuasive power of this kind of legislative history, it does not rely on it here.

property that *is* exempt under . . . State or local law." 11 U.S.C. § 522(b)(3)(A). A statute intended to preempt state exemption law territoriality requirements would instead likely provide that exempt property is any property that *would be* exempt under State or local law. *See Fernandez*, 445 B.R. at 812. Congress might have even been more clear and made explicit the contrary to fact condition implied in the "would be" language by stating that property exempt from the bankruptcy estate is any property that "*that would be exempt if said property were located in or subject to the State or local law*." *Id.* (emphasis in original). In fact, the Supreme Court twenty years ago held that Congress used a subjunctive construction in another part of § 522 to indicate when certain aspects of state law should be disregarded. *See Owen*, 500 U.S. at 311 (contrasting the phrase "is entitled" with "would have been entitled," and noting that the second phrase "denotes a state of affairs that is conceived or hypothetical, rather than actual, and requires the reader to disregard some element of reality"). The Court cannot ignore the fact that Congress used the indicative form "is" and not the subjunctive, "would be," and must interpret the statute as written. *See Johnson*, 632 F.3d at 922 ("courts must presume that a legislature says in a statute what it means and means in a statute what it says") (quotation omitted). If Congress intended a preemption of state law, it would have so indicated in the statute.

In sum, after considering the benefits and drawbacks of each possible interpretation, the Court finds that the second view of § 522(b) is the correct one. The bankruptcy court below erred when it decided that state exemption laws could never have extraterritorial effect and that Congress failed to appreciate this limitation when it drafted the statute. Instead, this Court finds that Congress wanted to respect limitations in state law on extraterritorial application of exemptions, and intended that debtors be allowed to use the exemptions of the state specified in

§ 522(b)(3)(A) to the extent that that state's law allows them to do so.

## C.     Extraterritoriality of Nevada's Homestead Exemption

Because the bankruptcy court below appears to have already ruled on this issue and the parties have briefed it, the Court proceeds to examine whether Nevada's homestead exemption is limited to resident debtors or to property located in Nevada. *See Fernandez*, 445 B.R. at 794-95; Appellant's Brief 18-21; Appellee's Brief 7. Following the procedure established in *Jevne* and followed in *Stephens*, the Court examines the Nevada Constitution, statutes, and case law, in that order, to determine the reach of Nevada's homestead exemption.[5] *See Stephens*, 402 B.R. at 6; *Jevne*, 387 B.R. at 304.

The Nevada Constitution has two sections dealing with exemptions. In the first, a general statement on debtor exemptions, the Nevada Constitution states,

> The privilege of the debtor to enjoy the necessary comforts of life shall be recognized by wholesome laws, exempting a reasonable amount of property from seizure or sale for payment of any debts or liabilities hereafter contracted; And there shall be no imprisonment for debt, except in cases of fraud, libel, or slander, and no person shall be imprisoned for a Militia fine in time of Peace.

Nev. Const. art. IV, § 14.

The terms "debtor" and "property" in this section are very general, and are not explicitly limited

---

[5]     The Court does not address the effect of Nevada's opt-out statute, since Debtor here is seeking to use Nevada, not federal, exemptions. However, the Court observes that the holding in *Camp II*, decided five days prior to the issuance of the bankruptcy court's opinion below, appears to directly contradict the bankruptcy court's conclusion that Nevada's opt-out law would apply to Debtor. *See Fernandez*, 445 B.R. at 813. Debtor is conceded to have been a resident of Texas when he filed his petition. *Id.* at 792. Nevada's opt-out statute states that the federal exemptions "do not apply to property owned by *a resident of this State* unless conferred also by" Nevada law." Nev. Rev. Stat. § 21.090(3) (emphasis added). *Camp II* held that when a state opt-out law is limited by its terms to residents, it does not apply to out-of-state residents. 631 F.3d at 760 (construing Florida statute that read in pertinent part, "residents of this state shall not be entitled to the federal exemptions.").

to Nevada residents or domiciliaries or to property within Nevada. The constitutional provision

dealing specifically with the homestead exemption is similarly general, stating,

> A homestead as provided by law, shall be exempt from forced sale under any
> process of law, and shall not be alienated without the joint consent of husband and
> wife when that relation exists; but no property shall be exempt from sale for taxes
> or for the payment of obligations contracted for the purchase of said premises, or
> for the erection of improvements thereon; Provided, the provisions of this Section
> shall not apply to any process of law obtained by virtue of a lien given by the
> consent of both husband and wife, and laws shall be enacted providing for the
> recording of such homestead within the County in which the same shall be
> situated.

Nev. Const. art. IV, § 30.

There is nothing in this provision limiting the reach of the homestead exemption to property

located in state, or making it available only to debtors or domiciliaries of Nevada. The only

possible justification for such a reading would be the last line, concerning the recording of the

homestead in the county where it is situated. However, the Court follows the view set out in

*Calhoun* and does not regard this line as restricting the reach of the homestead law. In *Calhoun*,

the court dealt with a Virginia statute that was similar to the Nevada constitutional provision here

in that it required the claimant to record a homestead deed "in the county or city wherein such

real estate or any part thereof is located" in order to gain the benefit of the homestead exemption.

*See Calhoun*, 47 B.R. at 123 (citing Va. Code Ann. § 34-6 (1984)). Following an earlier case

dealing with the same statute, the court held that property located outside the state was not

properly exempt because the claimant had not filed the deed in the out-of-state county where the

property was located. *See id.* (citing *Cappetta*, 33 B.R. 755). Here, just as in *Calhoun*, claimants

may comply with the constitutional directive to record the homestead in the county where it is

situated regardless of what state the homestead is located in. Therefore, the Court finds that the

Nevada Constitution does not limit the availability of homesteads to in-state property or in-state debtors.

The Nevada statutes dealing with homesteads do not restrict the availability of the homestead exemption either. A "homestead as provided for by law" is exempt from execution pursuant to Nevada law, Nev. Rev. Stat. § 21.090(l), and Nevada law states,

> "Homestead" means the property consisting of:
>
> > (a) A quantity of land, together with the dwelling house thereon and its appurtenances;
> > (b) A mobile home whether or not the underlying land is owned by the claimant; or
> > (c) A unit, whether real or personal property, existing pursuant to chapter 116 or 117 of NRS, with any appurtenant limited common elements and its interest in the common elements of the common-interest community,
> > to be selected by the husband and wife, or either of them, or a single person claiming the homestead.

Nev. Rev. Stat. § 115.005.

Nevada statutory law also provides, subject to a few exceptions, that a "homestead is not subject to forced sale on execution or any final process from any court." Nev. Rev. Stat. § 115.010. Nothing in these sections limits the availability of homesteads to property located within Nevada or to debtors residing there. *See Fernandez*, 445 B.R. at 794 ("By its express terms, the [homestead] exemption is not self-limited to property located within the state of Nevada."). Other states' exemption laws illustrate the form such restrictive language might take. For example, Kentucky exempts a portion of a debtor's interest in "real or personal property that such debtor or a dependent of such debtor uses as a permanent residence *in this state*." Ky. Rev. Stat. Ann. § 427.060 (emphasis added). Similarly, Hawaii exempts a portion of a debtor's "interest in one parcel of real property *in the State of Hawaii*." Haw. Rev. Stat. § 651-92(a) (emphasis

added).  Other states, such as Iowa, condition the availability of some exemptions on the residency of the debtor, and where there is no such residency requirement, the courts have interpreted the exemption as not being limited to residents.  *See Stephens*, 402 B.R. at 7 (contrasting Iowa statute giving an exemption only to a "debtor who is a resident of this state" with another containing no such restriction); *Williams*, 369 B.R. at 474-75 (same).  There being no language like this that would limit the Nevada homestead exemption to property located within Nevada or to debtors residing there, the Court finds that Nevada statutory law does not preclude Debtor from being able to claim the homestead exemption on his Texas property.

Turning to Nevada case law, the Court concludes that the case law does not limit the availability of homesteads.  Neither the bankruptcy court nor Trustee have cited any Nevada case directly holding that the homestead exemption is limited to property located in state or to residents of the state.  Instead, the only support for such a limitation comes from remarks in passing in two cases, and the language does not support the weight placed upon it.  In *Smith v. Stewart*, 13 Nev. 65 (1878), the Nevada Supreme Court compared the methods of designating a homestead under old and new versions of the homestead law and noted that under the prior version of the statute, the claimant "might notify the officer of what he regarded as his homestead at the time of making the levy."  13 Nev. at 70.  The bankruptcy court concluded from this that the homestead was only intended to operate in state, during executions by Nevada state officers. *See Fernandez*, 445 B.R. at 794-95.  But when the Nevada Supreme Court noted in passing the role of the officer in making a levy against a homestead, it was discussing a version of the statute that was already obsolete at time, and the statute has since been further amended many times. *See, e.g.*, 1879 Nev. Stat. 140-141; 1965 Nev. Stat. 28; 1975 Nev. Stat. 215, 981; 1977 Nev. Stat.

933, 1492; 1979 Nev. Stat. 984; 1981 Nev. Stat. 625; 1991 Nev. Stat. 579; 1995 Nev. Stat. 225;

1997 Nev. Stat. 3419; 2003 Nev. Stat. sec. 18; 2007 Nev. Stat. sec. 4. Whatever interpretation

the Nevada Supreme Court placed upon the first version of the law only controls now to the

extent that the first version of the homestead law is similar to the current version. *See Stephens*,

402 B.R. at 7 (finding state supreme court decisions not to control because they were based on

earlier, materially different versions of the homestead statute). There is no indication in the

current version of the law that it is only to be limited to situations when a Nevada sheriff is

attempting to conduct an execution upon a Nevada property. Moreover, nowhere in this or any

other section of the opinion in *Stewart* does the Nevada Supreme Court actually state that the

homestead law should only apply to property located in Nevada. That the exemption law arose

from circumstances dealing with in-state execution of judgments is a fair assumption, but that

does not rule out the possibility that the statute was drafted so broadly as to allow for

extraterritorial effect in the proper circumstances.

The other case cited by the bankruptcy court actually supports the Court's position, and

not the bankruptcy court's. In *Jackman v. Nance*, 857 P.2d 7 (Nev. 1993) (per curiam), the

Nevada Supreme Court described the purpose of the homestead laws in rather broad terms,

stating,

> The purpose of the homestead exemption is to preserve the family home despite
> financial distress, insolvency or calamitous circumstances, and to strengthen
> family security and stability for the benefit of the family, its individual members,
> and the community and state in which the family resides. These values are of
> greater importance to the polity than the just demands of those who may be
> financially disadvantaged as a result of the homestead exemption.
> . . . .
> The wealth of case law concerning homesteads reflects a judicial tendency to
> construe homestead laws liberally in favor of the persons for whose benefit they

were enacted.
857 P.2d at 8 (citations omitted).

The bankruptcy court focused upon the "state in which the family resides" as an indication that

the Nevada homestead law was focused solely upon protecting Nevada debtors.  But the Court

cannot see how this language supports the interpretation placed upon it by the bankruptcy court.

The language itself contains no reference to the state of Nevada, and instead, by referring to the

state of residence of the family, is drafted in such a way as to encompass debtors located in other

states.  The word choice is also significant.  Because it speaks in terms of values and not policies,

the Nevada Supreme Court's language supports a wide-reaching, extraterritorial application of

the homestead law.  The "values" mentioned in the opinion as the purpose behind the law,

namely, strengthening family security and community stability, are expansive.  Nevada is more

likely to allow its law to apply extraterritorially to give effect to these values than it would be if

the law were simply grounded in financial concerns about destitute citizens becoming dependent

on Nevada state funds for their welfare.  *Cf. In re Hafner*, 383 B.R. 350, 352-53 (Bankr. N.D.

Fla. 2008) (citing *In re Hill*, 163 B.R. 598, 601 (Bankr. N.D. Fla. 1994)) ("The purpose behind

exemption statutes is to protect the public from the burdens of supporting a destitute family.").

The line in *Jackman* indicating that courts construe homestead laws liberally supports this more

sweeping interpretation, in its recognition that the homestead exemption laws are supposed to be

liberally construed.

    This rule of liberal construction, which supports extraterritorial application of the

homestead exemption, finds significant, continuing support in Nevada case law since the days

after the state first joined the Union.  In one early case dealing with the topic, the Nevada

Supreme Court acknowledged that the homestead law was purposefully general and vague so as to allow for expansive readings in appropriate circumstances:

> "The homestead estate was one unknown to the common law, and is of very recent origin, having been created by statute and under the construction given by the courts. As might have been reasonably expected in the legislation upon a new subject-matter, the statutes did not in express terms anticipate and provide for every possible phase of the question, and the courts have been called upon to construe and apply the law to new cases as they would arise. This construction has almost invariably been a liberal one, and designed to carry out the beneficent purposes and intention of the legislature. This court has repeatedly called attention to the necessity of more specific legislation on the subject, and in the absence of it has been forced to decide cases not so much from the letter of the law as from its evident spirit and intention."

*Roberts v. Greer*, 40 P. 6, 7 (Nev. 1895) (quoting *Blum v. Gaines*, 57 Tex. 119, 121 (1882)).

The rule of liberal construction has been emphasized in almost every decision dealing with homesteads in the years since. In *In re Lavendol's Estate*, 209 P. 237 (Nev. 1922), the Nevada Supreme Court said that when dealing with exemption statutes, "a liberal construction will be given to secure the relief intended, where a proper case arises for which the statute makes provision." 209 P. at 239 (citation omitted). In *I.H. Kent Co. v. Miller*, 366 P.2d 520 (Nev. 1962), the Nevada Supreme Court said of the homestead exemption that its purpose was "to secure the home of the family even at the sacrifice of just demands, the preservation of the home being deemed of paramount importance as a matter of public policy." 366 P.2d at 522. In 2001, the Nevada Supreme Court reiterated that "[t]he case law of this court and other jurisdictions reflects a judicial tendency to construe homestead laws liberally in favor of the class of persons for whose benefit they were enacted." *Besnilian v. Wilkinson*, 25 P.3d 187, 190 (Nev. 2001) (en banc) (citations omitted). Finally, in a pair of decisions in 2007 the Nevada Supreme Court once more confirmed that it "has historically and liberally construed the homestead exemption in favor

48

of the debtor," *Savage v. Pierson*, 157 P.3d 697, 699 (Nev. 2007) (en banc), and that "Nevada's

exemptions have historically been 'absolute and unqualified,' with few exceptions." *In re*

*Contrevo*, 153 P.3d 652, 654 (Nev. 2007) (en banc) (quoting *Elder v. Williams*, 16 Nev. 416, 423

(1882)). In light of this long line of authority, and there being no cases holding to the contrary,

this Court concludes that there is no support in Nevada case law for limiting the reach of the

homestead exemption to residents of Nevada or to property located there.

The Court must now determine how to construe this absence of any state law authority

limiting the reach of the homestead exemption. As explained above, some courts hold that the

absence of authority weighs against extraterritoriality. These courts have supplied several

rationales for this interpretation, such as a lack of evidence of legislative intent for extraterritorial

application, concerns over forum-shopping, and a desire to protect creditors' expectations. *See*

*Stephens II*, 2011 WL 1790777, at *2; *Schlakman*, 2007 WL 1482011, at *3. However, the

Court does not find these arguments persuasive. First, the legislative intent argument cuts both

ways; silence over extraterritorial restrictions could just as easily be interpreted as a refusal to

limit the reach of the laws. Second, after BAPCPA, concerns over debtors shopping for

favorable exemption forums are now addressed in the bankruptcy statute itself through the 730

day look-back. Third, the Court is not convinced by the few references in the case law to the

need to uphold creditors' expectations that certain property would not be exempt, especially in

light of the "substantial" minority view giving state exemption law extraterritorial effect.

*Schlakman*, 2007 WL 1482011, at *3; *Nickerson*, 375 B.R. at 872 & n.7 (noting that some states

do allow non-resident debtors to use their exemptions).

The case for interpreting silence in favor of extraterritoriality is more convincing. Federal

law has long given effect to state exemption laws, including Nevada's, in bankruptcy proceedings, and with this there has been the potential, however slim, for debtors to seek to take shelter under those laws after leaving Nevada or for property located outside Nevada. Yet no authority, whether constitutional, statutory, or decisional, has limited the reach of the homestead law. *Cf. Camp II*, 631 F.3d at 761 (deducing a state legislature's policy choice from its failure to change the language in an exemption statute). The most that might be said is that the historical origins of the homestead exemption lie in prohibitions on executing against property and debtors in Nevada, but these origins do not indicate that the Nevada legislature intended to narrowly circumscribe the reach of the homestead law and limit it to this original context. In fact, they indicate just the opposite. The Nevada Supreme Court early on noted that the Nevada courts frequently had to apply homestead laws to situations not precisely envisioned by the Nevada legislature, and that the courts' "construction [of the homestead law] has almost invariably been a liberal one, and designed to carry out the beneficent purposes and intention of the legislature." *Greer*, 40 P. at 7 (quotation omitted). The Nevada Supreme Court has also expressed longstanding, staunch support for liberal construction and broad interpretation of exemption laws in general and the homestead law in particular. *See Virissimo*, 332 B.R. at 203 (acknowledging the liberal homestead construction rule in Nevada); *In re Norris*, 203 B.R. 463, 465 (Bankr. D. Nev. 1996) (same).

In applying the homestead law to a set of facts perhaps not foreseen by the legislature, the Court is doing what the Nevada Supreme Court began doing over one hundred years ago. Just as the Nevada Supreme Court has done and has indicated it will continue to do, the Court must give the homestead exemption a broad reading to achieve the law's beneficent purpose. Thus,

because there is no authority to the contrary, because Nevada state exemptions are to be construed liberally in favor of the debtor, and also because Congress's policy is to give debtors in bankruptcy a "fresh start," *Williams*, 369 B.R. at 476, this Court holds that Nevada's homestead exemption protects Debtor's property located in Texas to the same extent as it would if both Debtor and the property were located in Nevada.

V.      **CONCLUSION**

Accordingly, the bankruptcy court's January 26, 2011, Memorandum Decision on Objection to Exemption is hereby **REVERSED**.  Debtor is not precluded from claiming the Nevada homestead exemption on his Texas property simply because he and his property are located out of state.  Debtor may claim the Nevada homestead exemption if he otherwise meets the requirements for the exemption set by Nevada law.  The case is **REMANDED** to the bankruptcy court for further proceedings consistent with this opinion.

The Clerk shall close the case.

**SO ORDERED**.

**SIGNED** on this 5th  day of August, 2011.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE